May it please the Court, Thomas Vassilou on behalf of Speech First. In nearly every case Speech First has filed, the university has tried to escape liability by unilaterally changing its policy. As those who litigate against universities understand, only a merits ruling and an injunction ensures that university administrators don't turn around and re-implement policies that chill unpopular speech on college campuses. The law, however, doesn't allow this maneuver, especially not in a case like this one, where the university only amended its policy after the district judge threatened them. The university still defends the constitutionality of its original policy, and the university has issued no controlling statement that it will not return to it. This Court should hold that the challenge harassment policy violates the First Amendment. I think I saw in the transcript there is at least the statement by counsel on behalf of the client. There is a statement by counsel. I think your view is that's not enough. Correct. It's not controlling for one, and two, precedent like FEMVAS and FFRF say that statements off the cuff by counsel are insufficient because one, it's not clear if they're controlling. It's not clear who they're controlling on, whether it's the president, whether it's someone with actual authority to adopt certain policies and the like. I think a force on the spot question is just insufficient, especially when we're dealing with First Amendment rights on political speech when the timing, the time sensitivity of these rights is at its apex compared to other constitutional rights. I'll just start with first why Speechless Claim is not moot. Speechless Claim is not moot because this Court can grant effectual relief. Effectual relief is possible here because the university's change in policy is textbook voluntary cessation and because the modified harassment policy has substantially similar constitutional problems. This is one of the weakest cases of voluntary cessation Speech First has ever seen. Texas State only amended its policy after the filing of the complaint, after the filing of the preliminary injunction motion, and after a preliminary injunction hearing where the district judge said he would issue an adverse ruling if they did not change their policy. Texas State is also still defending its original policy, not only the constitutionality of its policy, but also the need for the policy in order to properly protect its students and even go so far as to say that federal and state law effectively requires the policy. The policy is also, Texas State has also issued no controlling statement and it's currently under pressure from the Biden-Harris administration's Title IX rules to change its policies again and revert back to one materially identical to the one challenged here. The policy is also easy to amend. It only took the university three weeks and a rubber stamp from the relevant official to change the policy. And in general, universities have a bad habit of re-implementing policies after the coast is clear or when administrators change. And Texas State, in particular, has had run-ins with the First Amendment before. Also, Texas State is resisting vigorously the preliminary injunction and there would be no need to do that if they had no intention to go back to the original policy. Mr. Vassilou, as to your effectual relief argument, what exactly, one of the things you argue in your brief is that we should enter a preliminary injunction. What is the nature of that P.I.? Are you asking us to enjoin them from reinstituting the old policy? So an injunction against enforcement of the original policy, which we would understand would also prevent them from bringing it back. And that's effectual relief because it removes the risk of returning to that policy and chilling and violating speech first members and First Amendment rights even more so than they currently are by the modified policy. But also a ruling issuing that preliminary injunction would also allow for there to be the law of the case and it would move forward the rest of the case as we go to the trial on the merits. And I think here there's an example of that from the Supreme Court in Roman Catholic Diocese of Brooklyn v. Cuomo, where they did enjoin enforcement of moving back certain facilities into a lower class policy that would have more COVID restrictions, even though they had already, the state had already changed and moved them out of that region. It's sort of the same thing here. And that's effectual relief because of the removed end risk. But as to the old policy, there are parts of it that are okay, right? Like it's not the whole thing on it. I mean, parts of it are obviously unconstitutional, but parts of it have problems, right? Like, I mean, parts of it don't have problems. Like you can't commit harassment properly defined, or you can't commit, or is your position that no, literally from the first word to the last word, the entire thing is unconstitutional? Well, it's facially unconstitutional because it's overbroad. So there might be a legitimate sweep in some respect in there, which is the conduct of the harassing conduct, actual physical conduct. But because it covers a substantial amount of speech and protected speech, it has to be facially overbroad and then enjoined in that respect. But I mean, if the court disagrees, a narrow injunction is impossible with it. But from enforcing the old policy, it would be to the respect, based on the reasoning and the opinion. And to just go into why it was facially unconstitutional, I mean, from the beginning, it does say it covers verbal conduct and therefore covers speech, and we know that also because before the district court, Texas State itself at ROA 627 and 629 acknowledged that it could cover pure speech. It just thought it was pure speech that is in the narrowly limited categories in which it is prescribable speech, like true threats and fighting words. But there is no actual limitation in the policy, textually speaking, to that amount of pure speech. And we've seen policies like this, like in Cartwright, where they have been interpreted and was reasonably interpreted to include political opinions like on gender identity, abortion, and the like. I mean, a statement that sex is immutable and that you can't change genders and the like would be greatly and deeply offensive to someone in that protected category, like a transgender-identifying individual. And that could easily be seen as interfering with someone's educational environment. And our position is, unless you adopt the Davis standard, you are adopting an overbroad and viewpoint discriminatory policy. And the reason for that and the reason why this court should care about Davis and its discussion of actionable harassment under Title IX is because the Supreme Court crafted that standard with the First Amendment in mind. And with the crucial differences— So if a policy, hypothetically—it doesn't necessarily be this case—if a policy were to be literally just incorporating Davis, no First Amendment problem as far as you're concerned? For all students' speech, yes. Because it's only sweeping in prescribable conduct, not protected speech, and that's because of the careful standard they adopted, which is they use phrases like severe and pervasive and the term denies instead of severe or pervasive and interferes. And in that way, it excludes mere comments, name-calling, microaggressions, a single instance of speech, or smaller harms like a mere decline in grades or a skipping class or a campus activity. And that's why the Supreme Court in Davis rejected the Title VII standard, precisely because it was not speech-protective enough. Adopting a standard that critically deviates from Davis, as the challenge harassment policy does, sweeps in a substantial amount of speech uttered daily, including isolated instances of a microaggression or speech on important topics, like speech first members want to talk about repeatedly, consistently with their peers on campus. And there's four features. Can I ask you about the and-or distinction, because I found that a bit curious? Is the idea that if you have something that satisfies all three prongs, the severe, pervasive, and offensive, as I recall, that suddenly that's more likely to be conduct rather than  I mean, talk to me about how that works. Because I can see a world in which it's all speech, even if it satisfies all three prongs. So with the and, one has to be not a single instance of speech, it has to be multiple instances of speech. And the way we understand the severity prong of that is that it actually excludes mildly offensive speech, even if it happens a lot. And so the effect of that is that there is some conduct being prescribed by the policy and not a pure speech claim. But if one did understand Davis to be less rigorous I don't understand that. But keep going. Well, if someone under still pure speech, the policy is written plus a verbal speech that and you're saying severe and pervasive and offensive or whatever else you want to hang on, it's still speech. I mean, I guess I'm agreeing with you and then then some. Well, so, Your Honor, if it is the case that a super friendly question standard even that even brings in sweeps in pure verbal harassment, I think we run into exactly what Judge Jones was talking about in in the footnote in FEMBES, which is such claims are self-evidently dubious because you cannot just prescribe protective speech as a whole. And the other way to perhaps look at Davis is that it's saying that you don't have a facially overbroad policy if you do adopt the Davis standard verbatim and that we could have as applied challenges later on. But we suppose what if I took to take the position that I'm not going to then I'm not going to use anybody's preferred pronouns on campus? I'm just not going to do it because it defies reality and it implicitly implicates me in just an obvious lie about sex. Does that. Why isn't that like right in the heartland of the rule? Our understanding of Davis, I mean, of the policy, our understanding of Davis is it wouldn't cover it wouldn't be severe. Why severe?  You don't think people can severely react if you don't follow their preferred pronouns? So when Davis, they can know, I mean, when Davis is laying out the standard, it excludes name calling and teasing. And this is a more akin to name calling and teasing. And I understand says who you at the University of administrators, I can promise you think that it's severe. And that's one of the fears here, Your Honor, is that it's only a single director in charge of investigating and enforcing the policy and not a group or more. And it's unilaterally, no one else can check on it. And it's still only a single university otherwise that deals with the exact sanction. I think the other thing, Your Honor, is, is the policy is also facially viewpoint discriminatory and we don't have to get in the exact line for the university to adopt in order to avoid an overbreath or facial viewpoint discriminatory. But the challenge harassment policy is also facially viewpoint discriminatory because it's directed at speech. And it only does a subset of characteristics that is speech on it being offensive or negative instead of other characteristics or speech that's positive. And that way, the policy is addressing a subset of characteristics and therefore a subset of speech that it finds offensive. And the way to know that is the only way to know if you violate the policy is what the speech what protected characteristic the speech implicates. So if it implicates gender identity, it's prohibited, but if it implicates political affiliation, it doesn't. And viewpoint discrimination in and of itself is an independent ground to hold the challenge harassment policy is violates the First Amendment. But Your Honor, I would agree. I mean, so using biologically accurate program pronouns is protected speech is currently going on the title nine litigation. There's a well-reasoned opinion by just the par and Meriwether. You have your Varner decision. I would agree that it would not rise to a level of violating the Davis standard if one what would to consistently and repeatedly use it. One is in the brave new world that we apparently live in. There are people who think if you don't use their preferred pronouns, you have denied their existence, which sounds pretty severe to me. The idea that a university administrator is not going to find that behavior if you do it every single day to everybody you meet is not going to be severe and pervasive. Nope, it will. And if that's so, in the opinion, we can say that types of this court can say those types of issues can be one aren't swept in by the Davis standard, which makes it clear for administrators in the Fifth Circuit that you can't use the standard to punish that type of speech. And it also will allow students, if it does happen, as applied challenges can happen otherwise. But we think when someone adopts it, as the court explained in Davis, that it excludes a sort of pure speech type claims of harassment and that they don't come in under the Davis standard. I think if I'm reading you correctly, you're essentially asking us to construe Davis in a manner that is as First Amendment sensitive as possible. Is that where you're going with this? Well, yes. I mean, consider the First Amendment, when crafting its standard, trying to exclude, you know, go up to the line of actionable harassment without clashing with the First Amendment. And so, in that way, it tells us something about the First Amendment. And the Eleventh Circuit recently agreed with that understanding of Davis in the Title IX case that we sent a 28-J letter on on Friday. And I think it's the underlying rationale of Cartwright, because what Cartwright is essentially— You're running out of time. Let me ask a few more questions real quick. Do we even have the new policy in front of us? In the sense that, did you ask for a P.I. with respect to the new policy or just the old? So, it's in front of this Court because the modified harassment policy shows that speech first claim is not moot and that— Right. I understand its relevance to the mootness analysis. I'm just asking just a straight up—you know, you are asking us to go further and actually do the injunction ourselves. Have you asked for an injunction as to the new policy or just the old one? Not yet, Your Honor. When we made clear at ROA 714.1 and at the hearing that we wanted a ruling on our original preliminary injunction motion to the original harassment policy, and as to this Court—I mean, the law of the case that this panel sets on the legal rule for the challenged harassment policy would affect as this case goes forward and if we file a motion on the modified harassment policy. You're going to ask in the future. You haven't asked yet.   Is the policy—how is the new policy—how does that depart from Davis? It's certainly got a lot of the same words. So, two parts. One, it's not even clear if all of the modified policy is entirely in effect. It conflicts with the system policy. Right. Let's talk about that in a moment. Well, that would— I get the system point exactly. I think that may be your most powerful argument. But that aside, I'm just curious, based purely on the text of the new policy, what else do you have besides the apparent conflict with the system? So there's a difference between—so the way the policy is written, it's based on the listener and not the speaker, which means that student speech on the employee— Is that true, though? Because I look at—pardon me for interrupting, but if you look at Section 5.03 after the A and B, doesn't the first sentence say an individual's subjective belief that behavior is intimidating, hostile, or offensive is not sufficient? Why doesn't that sentence take care of your concern that this is giving the listener a  Well, the reason why I'm saying the listener is because it says subjects a student versus subjects an employer. Regardless of whether it's subjective or objective, what I mean to say is that the first line that uses severe or pervasive is for a speaker on employee speech, not—or sorry, a student on employee speech, which means it's deviating from the Davis standard when a student is talking to an RA or talking to a professor or talking to someone else that's an employee of the school. And our contention is that the Davis standard is for all student speech and not just for student speech. Oh, I see what you're saying. A applies to the student speaker. Yes. And apply to the student would-be victim, I suppose. Correct. Okay. That's how we understand it. And Davis protects students whether—regardless of who they're talking to. I understand of the logic of Davis. Davis itself involves student-on-student harassment, but we think the understanding of the First Amendment and the careful craft standard of what you need to exclude in the type of speech. And even on top of that, Your Honor, I think if anything, student-on-teacher speech needs to be more protected, not less. And we lay that out in our opening brief, which is there's a hierarchy difference. The teacher should be able to handle more speech, not less speech when it comes to these issues and things of that nature. But we don't need an exact line. I think the court just has to say the modified policy still doesn't adhere, still has constitutional problems, and because of the system policy, in fact, deviates from Davis for even student-on-student speech. I do have one last question, I apologize. Your brief goes at some length about how the district court handled these proceedings and it referred to some of the comments as unusual. What do you mean by that? Your Honor, I think the first thing being unusual, and I must confess, I've been to several preliminary injunction hearings, but I might not have the experience of my colleague on the other side, but the first thing is, instead of issuing an injunction or tailoring the injunction that he believed should have been issued at our first hearing, he gave the university a chance to amend its policy and holding us in abeyance. Typically we would have the injunction issued from that point. The second thing is the policy or the opinion that we see from the court after the second motion suddenly involves ruling on the updated policy almost entirely with a conclusory footnote addressing the potential voluntary cessation and mootness problems here, and I think both things are unusual from a typical preliminary injunction standpoint. Are you asking us to do something or is this just background information? I think it's background information. We're not asking for reassignment or anything like that. Thank you. Thank you. You've reserved five minutes. Ms. Klusman? Thank you. May it please the Court. Beth Klusman for the Texas State Defendants. There are undoubtedly some fascinating issues at the intersection of harassment law and First Amendment, but this is not the case to decide them. Two primary reasons, of course. We have pulled the policy down. If we want to have that discussion at the end of this case, we can do so, but there's no need to do so at the preliminary injunction stage. And second, these students, students A, B, and C, their speech hasn't been, excuse me, has not been restricted. It's not arguably prescribed by the former policy in the first place. And so they have always been free to speak their mind. And I think if the Court is concerned what a university administrator might think is offensive or might think is severe, the answer is to say conservative speech is none of those things. It is not inherently discriminatory. It is not objectively offensive, and hearing it does not interfere with your education. And so if that is the Court's concern, the best ruling in this case is to decide it on the standing question and hold that the speech that students A, B, and C wish to make does not fall within the rule. So to look at the old policy, then let me just push back on this and see where it goes. Unwelcome, based on race, sufficiently pervasive, and offensive or hostile, right? If you meet all those, you have triggered the policy and violated it, agreed? Unwelcome. If it's unwelcome, unwelcome verbal or written. It must also interfere with your education. I would throw that one in there as well. Okay, so suppose a student opposes the use of race in undergraduate admissions and for whatever reason wants to talk about this frequently. It's pure political speech, no harassment, there's no physical harassment, but it is a statement that this person feels very strongly about. Presumably that could be very offensive to members of racial minority groups that may have benefited from that policy. Why wouldn't they find it unwelcome? It would be based on race. It would be pervasive. I'm stipulating that these are frequent comments. And why wouldn't, so the only question is, would they find that offensive or hostile? It's not a stretch to say that that's hostile. You're saying that I don't deserve to be here. It's not based on race, Your Honor. Opposing affirmative action is not a racial-based position. It is a position as to how- But you're familiar with the arguments over that policy. People argue that it's- Go ahead. The Supreme Court has- Over a dissent. That affirmative action in university admissions is illegal. And so I can't be racial harassment to voice that position in court or in a classroom. And the court should not follow- That wouldn't be a comment directed at the races that benefit from those policies? Your Honor, the students, A, B, and C, wish to speak to their classmates who disagree with them. That's all we know. There's no intention to direct, like, I'm only going to talk to black people about affirmative action. That's nowhere in the record, Your Honor. And I'm not sure that that would even make the- You have to direct it at someone because of their protected class. And so arguing about affirmative action is not arguing against, you know, someone's race or arguing they shouldn't- It's just- It's not- You shouldn't buy into that narrative that that is a racist position to hold. You should also not buy into the narrative that having that discussion interferes with your education. Again, this policy is required to be applied not just subjectively, but also objectively. And so the court would have to say it is objectively interfering with your education to hear political positions with which you disagree. We also have to say it is- How does it square with our precedent in FENVAS? The speech- The mootness piece or the standing piece, or both? Well, we're actually sort of talking about merits right now, so- FENVAS didn't reach the merits. Right. But it talked about- Maybe I'm confusing cases, but I thought it went into- No. The district court had dismissed for a lack of standing, I believe. And so the court on appeal said there was standing, but then remanded for further consideration of that. But I'll address the standing piece just because that's where we are right now. The policy in FENVAS was, in fact, very different from the policy here. There are four policies at issue. They're focusing on one, the chart that they put on page 15 of their reply brief that attempts to compare the two policies. It shows the protected classes for Texas State's policy. It doesn't show it for FENVAS because the protected classes included verbal harassment, included threats, insults, ridicule, and personal attacks based on, among other things, ideology, political views, or political affiliation. So that would have included the students or the speech that students A, B, and C want to make. And so that makes FENVAS' policy very different from a standing perspective than we have here at Texas State, which it does not include speech directed at someone because of their ideology, political views, or political affiliation. If that's what Texas State's policy said, I wouldn't have this argument because, obviously, that's what their speech intends to talk about, those things. And those things were part of the policy in FENVAS. They're not part of the policy here. Is the position of Texas State that there have been 28, I gather there's been a school year intervening the closure of this PI record and today, but as of, I guess, the summer of 2023, there had been 28 complaints initiated under the policy, I guess the whole policy? In the previous six years. All the way to 2017, right. So there are only 28 complaints. None of them resulted in any form of action. And so therefore what? Therefore there's no irreparable injury to would-be speakers? Is that the idea? I think what that goes to show, Your Honor, is number one, our position as to what this policy means is not a litigation position. It's the position that Texas State has been applying. And number two, it eliminates the argument that even if their conduct or their speech was not arguably prescribed, Texas State was still secretly doing it anyways. So that's, I think, the purpose of both of those. Can we talk about the first one? Because that's the one, I confess to having some confusion about how this operates. So I'm looking at the declaration that, this is the Alexandria Hatcher. So this is on 638. And this is paragraph 10, and she's explaining how she goes about adjudicating, or at least her office. It's unclear how many of these are her and how many of these are her predecessors going back to 2017. So I'm not sure when exactly, but paragraph 10 is the one I was most intrigued by. So this person calls transgender people pedophiles, shows up to a panel discussion wearing a Make America Great Again t-shirt, knowing the panel consisted of individuals with gender-fluid comments on the class blogs under the alias, just a conservative student at a liberal college. That's the allegation I'm focused on. Ms. Hatcher says that's not actionable and doesn't warrant any form of investigation because it wasn't directed at a particular person. Why don't, I don't understand why that matters. The policy says it doesn't need to be directed at a particular person. Well, I, even though some listeners, yes, were, it was not directed at one or more individuals. So you have to direct it at an individual or a group based on their protected status under the policy. But the policy literally says the opposite. That's what I'm so confused by. So if you go compare it to, this is page 127. Harassment does not have to be targeted at a particular individual in order to create a harassing environment. Yes, Your Honor. But, and let me just, let me quote on page 126, harassment must be directed at an individual or group of individuals. And so how I would think of that is, you know, for example, what we've seen at UCLA, students, Jewish students were not allowed on campus. That's not directed at a particular individual, but that's directed at a group of individuals. So if, in Judge Ho's hypothetical, if it said, I'm upset that there are beneficiaries of affirmative action at Texas State, would that be directed at a group of individuals? I mean, not because of their protected class, but. What if it said, I'm upset that there are DAPA or DACA recipients at Texas State, would that be targeted at a group of individuals? Again, I would say not because of their protected class status. Illegal or legal immigration is not a protected class. What if it said, I'm unhappy with, it's an October 7th protest and they're targeting members of the Jewish community at Texas State, would that be group, at a targeted group of  I mean, again, I don't know who you're speaking to. If you're just announcing this on campus, then no, you've not targeted anybody. So blog posts are totally safe, because you're not targeting them at anybody? What was that you're on about? A blog post would be, that's totally protected? I think it should be. Twitter, totally protected, or whatever, X. Again, it has to be in connection with the university program or activity, so I would think that your personal blog posts. What about posting on a Bolton board? I don't know if the students, we still have this anymore, but when I was in college, you could put something on a Bolton board, would that count? I think that would, if someone made a complaint, they would consider that, but I don't think that in itself would be sufficient to establish harassment. And if I could just back up for just a second, all of the hypotheticals are irrelevant until they establish their standing. They can't argue overbreadth as to anyone else's speech until they establish that their own speech is arguably prescribed here. And so I do want to just make that clear while we go through the hypotheticals. And is your view that in determining whether it's arguably prescribed, I should read the policy or I should read the Hatcher Declaration? I would go with the policy, and then if you had any concern, if again, if you don't think it's arguably prescribed, but you still have concerns as to how the university's been applying it, that's where the Hatcher Declaration comes in. So really, all I need to do is to read the, because at least in material part, for the stuff that we're discussing it now, the old policy and the new policy are the same? Because we're not talking about pervasiveness or whatever, the and or distinction. I'm sorry, I didn't quite- What you and I are discussing right now, this is the same under the old policy and the new policy, right? I think it should be. I mean, the language directed at, I don't think is part of the new policy, but it's subjecting an employee or subjecting a student. So obviously, I think it's implicit that you're directing it at that employee or student in the new policy. Let me walk with you, counsel, through one of the examples that we talked about with counsel opposite. If I take the position that calling someone who's a man by feminine pronouns because he wants me to is not something I'm going to do, so I'm not going to use the preferred pronouns of, say, a teacher or a fellow student. Just looking at the policy, the policy says, it defines harassment as unwelcome verbal conduct, I guess that's speaking, directed at an individual, it would be directed at an individual because of their gender expression or gender identity. So, I think, I would think we're firmly within the four corners of the policy so far. And then sufficiently severe or pervasive. So as I've said, it seems self-evident to me that there are many people in our society today who consider this a severe form of disrespect. So as to interfere with their participation in programs or activities, you know, you're not calling me what I am, and it creates a, you know, working, it creates a learning environment that one might find intimidating, offensive, or hostile. So that example, at least just judging from the words of the policy, seems to fall directly within the policy. So if I were a student there, and that were my view, and these students have said, you know, one of their beliefs has to do with gender, why am I not objectively and subjectively just sort of chilled by the existence of this policy? Well, and I guess it comes down to who, because you have to judge this not just objectively, are you objectively interfering with someone's education? I would point to the Sixth Circuit's decision in the Merriweather case, where it was a professor who declined for her pronouns throughout the year. Now one of the defenses the university offered for taking action against him was it might be harassment. And the court said, well, you haven't explained to us how this, you know, limited their education, or I think this, let me see, this second piece of that was, I apologize, you're on mute. No, no, I get it. I understand. That it was offensive. They actually said, we don't understand why this is offensive. Yeah, I understand that, that you're pointing to, look, I get your argument, I mean, you're pointing to a decision from one circuit court that was fiercely contested all the way up to the Sixth Circuit. I don't know whether, I guess that's Merriweather, it's probably CERT that wasn't sought, I don't know if CERT was sought in the case, but it's a fiercely contested issue. And isn't it very easy to imagine that an administrator might just say, well, you know, that's not the law here, I'm going to take a different view. I just, as a student at a school like this, I would think twice about what the consequences would be of me doing that. Well, number one, none of these individuals indicated an intent to use, you know, target someone with non-preferred pronouns, for number one. And second, I mean, that is reason why this court should hold that that kind of speech is not objectively harassing. That would be an interesting and kind of backhanded way to reach the same result in Merriweather. And yet, you would win, so. I mean, everybody, I think, agrees that these students should be allowed to say what they want to say. The question is how we get there. I say, not everybody. We. You mean we right here? The parties agree that these students should be allowed to say what they want to say, and the question is how we get there. Do we get there by saying conservative speech is objectively offensive, discriminatory? I know that you say that in your brief conservative speech, but the terms of the policy is not about conservative speech. But the problem is also the Davis standard isn't going to fix that, as you also pointed out. I'm sorry. The Davis standard isn't going to fix that. The Davis standard is severe, pervasive, and objectively offensive, and that exact standard would apply the exact same way to the speech you have suggested. So what they have asked this court to do isn't going to fix the problem. If that is, in fact, going to be the problem. The only way that problem is going to be fixed is to declare that, I'm sorry, using preferred pronouns or non-preferred pronouns, it's not going to be an objectively offensive action that denies you employment or education, because, of course, we know from Bostock, we're going to have to apply this in the employment context as well. I don't know whether we are or not. Isn't that under litigation? I think Bostock, for the employment purpose, but. Oh, I thought you meant title IX. Title IX. That, of course, kind of throws a lot of that into question. Ms. Klusman, in determining whether speech is prescribable, does Davis allow university administrators to consider the totality of the circumstances? Yes, Your Honor, except the phrase it used was constellation of surrounding circumstances, expectations, and relationships. So what is exactly the student supposed to do in determining whether and to what extent their speech is going to be prescribable? Right? So, like, that's what I don't understand about any of this, is, like, if the student is thinking to himself or herself, oh, I'm thinking about expressing this view in class or putting up a thing on the bulletin board or whatever, having a hosting an event, doing a debate, but I don't want to get sanctioned and have something written up to me. I don't understand ex-ante what the student is supposed to do. They would look at this policy. But it says totality of the circumstances, and you're telling me, Davis, that's basically the same thing. Yes. And so there's no way ex-ante to know what the OEO is going to do under the totality of the circumstances, considering a list of, I don't know, I didn't count the factors, but it's not just those.  It's totality. It's all the factors. So there's no way to know whether it's prescribable or not. But, I mean, I guess, these are words that the Supreme Court and this court have used in the employment harassment context. So if you are an 18-year-old employee, you are expected to understand that. So I don't know why that's different for an 18-year-old student who can't be expected to understand the same thing. So, I mean, that's part of the problem, is these are words that the Supreme Court and this court has given us to guide us into what harassment means. Texas State has done its best to put them into a policy. Now whether that policy should also apply to employment speech as well as student speech, I mean, we can have that discussion, but those are the words that the Supreme Court has given us. And that's what we have tried to do. And so if that's insufficient, that's a problem with what the Supreme Court has said. Do I understand from your 28-J letter that based on the various injunctions against the new 2024 Title IX rule, Texas State has not changed its policy from what it was at the time of the P.I. hearing? Correct. The policy they adopted in 2023 is still current, yes. And they, again, do not intend to change it, especially in light of the injunctions governing the Title IX case. I'll just quickly then touch on mootness, which we haven't discussed yet. I think really that it's about whether or not they've proven there's an irreparable, a substantial threat of irreparable harm. You know, I think we would not have made a mootness argument if Fenves was controlling. I think Sands undermines Fenves. But whether or not a two-sentence Munsingware opinion from the Supreme Court is enough for this panel, I would understand if that wasn't. But I do think it undermines some of the arguments that Speech First has made. So, for example, Fenves, or excuse me, and Sands, they argued, well, you're still defending the constitutionality of your policy, therefore it can't possibly be moot. It was still moot. If it's not enough to overcome mootness, it cannot be enough to show a substantial threat of irreparable harm is about to happen. The same thing for the lack of a binding statement or even the timing. I mean, in this case, the district court talked a lot about why he was doing what he was doing, and it was, he gave Texas State a choice. You can have no policy that prevents unlawful harassment, or you can try and adopt a new policy. And they picked the policy that Speech First thought was okay for its University of Houston members that apparently now it has changed its mind and thinks is unconstitutional. But the policy— Although, in fairness, didn't they reserve that issue in the settlement itself? They did not concede that it was constitutional, Your Honor. Right. But I would point out that it applies the Supreme Court's harassment precedent as to employees. That's, if you read Harris v. Forklift Systems, that is the part that applies to employees, and then it applies the Davis standard to students. Now, they complain those are two different standards. That's because the Supreme Court has given us two different harassment standards, one in the employment context and one in the student context. And so to the extent students are speaking to employees and harassing employees, that's barred by Title VII. And so that would be—that's why you invoke the employment standard there. Just to play that out, though, would it—pardon my ignorance, but Title VII governs, of course, the employer's speech, and employees speaking to other employees, I suppose. Students aren't in that category, are they? This Court has held that certain—if I could finish my— Please. This Court has held that employers have the obligation to prevent certain third parties from harassing their employees. So, for example, nursing home residents are not permitted to harass the staff, even though they're not employees. The Second Circuit— So your concern is that it would apply to students? Yes. The Second Circuit has applied it to students, and so that's why—I mean, if this Court wants to hold that we, you know, universities have no obligation to stop students from harassing employees under Title VII, then we will have an answer to that question. But until then, we do have— You're worried about the open question. So, yeah. You're worried about the fact that it's open. We're worried about what? You're worried about the fact that it's an open question in our circuit. It is an open question, yes. And so, you know, we are obligated to do our best to protect our employees, our students, shield our—you know, protect our taxpayer funds. We don't want—you know, we want to stop unlawful harassment. That's all we want to do. If you just tell us where the line is, that is the line we will adopt and we'll do it. So for those reasons, Your Honor, we ask that you would affirm the denial of the preliminary injunction. Mr. Vassilou, you've reserved five minutes. Thank you, Your Honors. A few points in rebuttal. The first, I mean, if Your Honors aren't—are not persuaded that Davis is protective enough, your opinion could reserve judgment but hold that universities at a minimum cannot exceed Davis. And then say what Judge Jones did in FEMVAS, that purely verbal harassment claims, much less speech-related prescriptions outside Title IX's protected categories, has not been—or are self-evidently dubious. That's footnote 16 of the opinion. Although FEMVAS didn't directly address the merits, it set out a warning shot that over-broadened harassment policies are unconstitutional, and despite Davis being decided in 1999, despite FEMVAS being decided in 2020, Texas State did not get the hint, and they didn't change their policy until after the filing of speech-first suit. The second thing is, I think, Judge Duncan, you're absolutely right that the policy covers things like using biologically accurate pronouns for someone who wishes to go by different pronouns. That's the position of the Biden-Harris administration right now for the Title IX rule. They expressly say that misgendering is covered by similar terms. Of course it is, and we shouldn't pretend otherwise. There's one side of this debate over such things thinks it's the end of the world if you don't do that, and the other side of the debate thinks that it is a question of political speech protected by the First Amendment. I recognize that there is one circuit decision that protects that, but I don't know why we need to pretend like this is not an issue that's going to come up again and again and  So, I guess I'm once again violently agreeing with you. And then the other thing, as to Judge Oldham, for your point as to the policy text itself, students are reading the policy. They're not looking. They don't have access to the disciplinary history of who got punished when or in what way, and if you go and look at the policy, I actually think it's quite broader than even having to be directed to a particular individual at the school. It says directed at a group, and then for Part B, it actually says interfere with an individual's employment or education. It doesn't say the individual has to be part of that group. It doesn't say it even has to be the individual that it was directed at. It just says an individual at the school. It would say And I, let me join Judge Duncan in agreeing. I don't understand. I read this Hatcher Declaration. I don't understand how any of the stuff that she says weren't investigated aren't violations of the policy, because they're all directed at an individual or group, and they all have the potential to interfere with a member person's educational experience. So I've never understood the dislike. She seems to be talking about a policy that's not in front of me. And as the Supreme Court said, we normally don't trust the government to enforce a policy responsibly. We go off the text itself, and we hold whether that covers protected speech or violates the First Amendment, and that's what the court should do here. As to Title VII, you know, it is an open question whether students would be covered by Title VII if it is the type of harassment. But the Title VII standard never considered the First Amendment when it adopted the standard, unlike Davis. And so I don't think it shows a whole lot to say Title VII might apply to it. The Constitution controls statutes, not the other way around, and that's what we should be beholden to. My last point is just on SANS. I mean, it would be a very tenuous reading to take a summary order of the Supreme Court to abrogate, to overturn Judge Jones's well-reasoned opinion in FEMBAS. And that's especially true when the circumstances in SANS were different for at least three reasons, which I'll quickly go through. The first is, it was a complete repeal. Here we have a modified harassment policy that still has problems. In SANS, we had a sworn affidavit from the president saying that they would not return the old policy or any similar one like it, any similar one like it. We have a similar one here, and despite us bringing up the fact that there has been no controlling statement time and time and time again, my friends have not issued one. And it's because they're under pressure by Title IX, or it's because they don't really want to adopt a policy, and they're ready to go back the second the coast is clear. The last point is in Virginia Tech, they won below at the District Court, they won at the Court of Appeals, and they argued mootness after. And the president swore again that it had nothing to do with the litigation. Everything here had to do with the litigation. Mr. Vassil, what do you do with Ms. Klusman's argument that none of your three plaintiffs are hurt by this in any way? That everyone, I mean, there seems to be like at the nub of this a certain, I don't know if it's an adversariness requirement or problem or what, but it's like both sides are agreeing that the stuff that you sued over, totally fine, not a problem, say it, have at it. Ms. Hatcher agrees, this counsel for the state agrees, you agree. So there seems to be like a agreement that is fundamentally antithetical to the adversariness requirement that we typically require. So as to the first point, I mean, they've switched theories as we've gone through. They initially argued tinker applied to the university context, which is a radical statement of free speech jurisprudence. The Third Circuit rejected it, Judge Newsom rejected it in Cartwright, and then they sort of adapted as we were going forward, likely trying to avoid this court's review or at least a broad ruling on the First Amendment. And I think the other part to it is adversariness typically goes to Article 3, but Article 3 is clearly met here. If, I mean, they say the policy covers conduct incident to speech, but I think they're really just relabeling conduct and call it, or sorry, relabeling speech and calling it conduct. And that's something the First Amendment prohibits. And I think in the end, I mean, this court should issue a ruling, hold that the challenge harassment policy violates the First Amendment and issue an injunction against its enforcement. Thank you. The case is submitted.